UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80130-CIV-MARRA

TITAN5 HOLDINGS LIMITED,
a South African entity, and
CALL CABINET SOUTHERN AFRICA
PROPRIETARY LIMITED,
a South African entity,

      Plaintiffs,

v.

MAJUDA CORPORATION,
a Delaware corporation,

      Defendant.
_____/

## OPINION AND ORDER

      This cause is before the Court upon Plaintiffs' Motion for Entry of Preliminary Injunction and Memorandum of Law in Support Thereof (DE 4). Defendant responded. (DE 8). No reply was filed. An evidentiary hearing on Plaintiffs' motion was held on February, 28, 2013. (DE 17). The Court has considered the briefs, exhibits, and argument of the parties, and is otherwise advised in the premises.

      This case arises out of an ownership dispute over software. In 1995, Ryan Kahan ("Kahan") became the founder and CEO of Plaintiff Titan5 Holdings, Ltd. ("Titan5"). (DE 13 ¶ 4, Ryan Kahan Aff.) ("Kahan Aff."). In 2005, Titan5 created a telecoms voice recording and logging system that the Court will refer to as the "Majuda software." (Kahan Aff. ¶ 5). Kahan incorporated the Defendant Majuda Corporation ("Majuda") in August of 2007 (Kahan Aff. ¶ 7), and on October 26, 2007 Titan5 entered into an agreement to sell the Majuda software to Majuda in exchange for the following: 1) Majuda would refund Titan5 for all development costs and expenses to date; 2) Titan5 would invoice all expenses to Majuda for approval; 3) Titan5 would continue to invoice Majuda for

monthly expenses; and 4) all suppliers would begin to invoice Majuda directly. (Kahan Aff. ¶ 8; DE 1, Attach. 3). This agreement, memorialized in an e-mail exchange between Kahan and a man named Terry Sack (a director of Titan5), also dictated that ownership of the Majuda software would pass once payment had been received in full and that, should payment not be received, Titan5 would be entitled to take back the Majuda software and any enhancements would be to Titan5's benefit.[1]

Plaintiff Call Cabinet Southern Africa Proprietary Limited ("Call Cabinet") and Titan5 (collectively "Plaintiffs") seek a preliminary injunction in this case on the grounds that Majuda never paid Titan5 pursuant to the terms of the agreement and that, accordingly, Titan5 either 1) remains the owner of the Majuda software because "ownership of the Majuda software would pass once payment had been received in full," or 2) is entitled to a reversion because "should payment not be received, Titan5 would be entitled to take back the Majuda software and any enhancements would be to Titan5's benefit."[2] Plaintiffs allege that Majuda is holding itself out to the public as the owner of the Majuda software and is otherwise generally infringing on Plaintiffs' ownership interest in the Majuda software. To that end, Plaintiffs bring a single count of tortious interference with a contractual and business relationship.[3] Plaintiffs assert that Defendant Majuda, through its CEO Michael Levy ("Levy"), contacted a purchaser of the Majuda software. The purchaser of the software is a customer of an entity named Majuda Software South Africa (PTY) Ltd. whom Plaintiffs claim is their exclusive distributor ("the exclusive distributor"). Majuda allegedly advised

---

[1] The Court makes no finding as to the validity of this e-mail exchange as a contract. The Court assumes the agreement is valid solely for purposes of this order. At the time of the "agreement," Kahan was the president and a director of Majuda, and CEO and one of five directors of Titan5. (Kahan Aff. ¶ 8).

[2] Plaintiffs claim that Call Cabinet is the exclusive licensee of the Majuda software. (DE 1 ¶ 7; DE 4 at 2).

[3] Plaintiffs' Verified Complaint for Injunctive Relief and Damages (DE 1) brings two counts: one count for tortious interference; and one count that is simply labeled "Injunctive Relief," which merely sets forth the elements required for a preliminary injunction without tying those elements to a particular cause of action. The Court interprets these two counts as a single count of tortious interference seeking injunctive relief. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("[A]ny motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. There is no such thing as a suit for a traditional injunction in the abstract.").

the customer that the exclusive distributor did not have authority to sell the software. Plaintiffs allege that this customer has an actual and identifiable relationship with the exclusive distributor regarding the purchase and installation of the Majuda software, that Majuda had knowledge of this relationship, and that the profits of that relationship would benefit Plaintiffs—the owner and exclusive licensee of the Majuda software. (DE 1 ¶¶ 36, 40). Plaintiffs further allege that Majuda's infringing conduct has severely and irreparably damaged the relationship between the customer and the exclusive distributor and that, as a result, Plaintiffs have been damaged. (DE 1 ¶¶ 39, 41).

"To obtain a preliminary injunction, the movant must establish that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Indigo Room, Inc. v. City of Fort Myers*, __ F.3d __, 2013 WL 765300, at *2 (11th Cir. Mar. 1, 2013) (quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir.2009)). Here, Plaintiffs have failed to establish any of the elements necessary to obtain injunctive relief.

In Florida, to state a claim for tortious interference with a business relationship, Plaintiffs must allege 1) the existence of a business relationship, 2) knowledge of the relationship on the part of Majuda, 3) an intentional and unjustified interference with the relationship by Majuda, and 4) damage to Plaintiffs as a result of the breach of the relationship. *See Lifestyle Vacation Incentives, LLC v. Sternfeld*, 11-81385-CIV, 2012 WL 4854766, at *2 (S.D. Fla. Oct. 12, 2012) (citing *W.D. Sales & Brokerage LLC v. Barnhill's Buffet of Tennessee, Inc.*, 362 F. App'x 142, 143 (11th Cir. 2010)). Plaintiffs allege that they were damaged by Majuda because Majuda misrepresented the true ownership of the Majuda software to at least one of the exclusive distributor's customers. As set forth below, Plaintiffs have failed to prove a likelihood of success on the merits in this case because, among other things, they have failed to establish that they have standing to bring this claim. "[A] corporation does not have standing to assert claims belonging to a related or closely affiliated

corporation simply because their businesses are intertwined." *Elandia Internat'l v. Ah Koy*, No. 09-20588-Civ, 2010 WL 2179770, at *6 (S.D. Fla. Feb. 22, 2010) (citation omitted). Here, Plaintiffs purport to have standing based on Defendant's interference with a contractual relationship between their exclusive distributor and its customer. The Court concludes that Plaintiffs have not demonstrated a likelihood of success in demonstrating standing to assert a claim for injuries from such an attenuated interest, a claim that appears rightfully to belong to the exclusive distributor. *See id.* at *7 ("It is well established that 'where the business or property allegedly interfered with by forbidden practices is that being done and carried by a corporation, it is that corporation alone who has a right of recovery, even though in an economic sense real harm may well be sustained by other entities as a result of such acts.'") (quoting *Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957)).[4]

Moreover, even if Plaintiffs do have standing to assert this attenuated claim, there is insufficient factual support in the record to determine where the "true ownership" of the Majuda software lies. If Majuda owned the software at the time of the alleged interference, a plausible conclusion based on the record, then Plaintiffs fail to meet the elements of a claim for tortious interference because Plaintiffs could not be damaged by Majuda rightfully asserting a claim to the Majuda software. Nor could Majuda have unjustifiably interfered with a business relationship between a purchaser of the software and an entity wrongfully holding itself out as its owner.

At bottom, this ownership dispute turns on whether Majuda actually paid Titan5 for the Majuda software, and whether ownership of the Majuda software was ever transferred from Titan5 to Majuda regardless of whether payment was made. Consistent with Kahan's testimony, a review of Majuda's balance sheet as of September 30, 2011 shows the Majuda software was Majuda's asset. Yet the balance sheet shows no liability to Titan5. (Kahan Aff. ¶¶ 17, 23; DE 17 at 127–36).[5] As a

---

[4] Plaintiffs' tenuous standing in this case goes to all four elements of a preliminary injunction because a party who lacks standing can neither succeed on the merits nor suffer the kind of injury necessary to obtain injunctive relief, and issuing an injunction in favor of a party who lacks standing would be adverse to the public interest.

[5] Kahan turned over control of Titan5 to Terry Sack and other Titan5 directors in around June of 2008 to go and work for Majuda as its CEO (DE 17 at 69). Kahan held that position through September 30, 2011 until around January or February of 2012, when Terry Sack resigned as a director of Titan5 and Kahan recovered control of Titan5's

threshold matter, the presence of the Majuda software on Majuda's balance sheet *as an asset* refutes Plaintiffs' contention that ownership of the Majuda software was never transferred to Majuda. Even assuming a corresponding liability for payment of the Majuda software was not accurately reflected on the balance sheet, Majuda would not list the Majuda software as an asset if Majuda did not own it.[6] That Kahan was Majuda's CEO during this period further undermines Plaintiffs' position.

In order to resolve Plaintiffs' contention that if ownership of the Majuda software was transferred to Majuda they are entitled to a reversion, some background is necessary. Around June 2007, after Kahan had incorporated Majuda, but before the e-mail purportedly memorializing the contractual arrangement for transferring ownership of the Majuda software to Majuda, Kahan, Levy, and a man named Alan Ber ("Ber") began to invest with a South African businessman named Barry Tannenbaum ("Tannenbaum"). (Kahan Aff. ¶¶ 10–12). Later that year, Kahan invited Ber and Levy to buy into Majuda through proceeds they hoped to receive from their Tannenbaum investments. (Kahan Aff. ¶ 13). Once Ber and Levy received the investment proceeds they would invest the proceeds in Majuda, which in turn would make payments to Titan5 to fulfill Majuda's payment obligations under the e-mail agreement. (Kahan Aff. ¶ 14). Under this arrangement, before any investment proceeds were realized, the Majuda accounting records should have shown an offsetting liability owed to Titan5 for the corresponding listing of the Majuda software as an "asset." Based on Kahan's testimony, however, that liability was never listed:

> In anticipation of the funds being paid to [Titan5] (by the proceeds of the Tannenbaum investments), the amount due to [Titan5] was brought onto [Majuda's] books (balance sheet) and, instead of payment being made, payment was reflected by assigning the amount owed to [Titan5] to the loan accounts of Ber, Levy and Kahan.

---

"books and records." (DE 17 at 60).

[6] As set forth above, one provision of the e-mail agreement provides that "[o]wnership of the source code and [the Majuda software] will pass once payment has been received in full" while another provision provides that "[s]hould payment not be received, [Titan5] will be entitled to take back the software and any enhancements will be for Titan5's benefit." (DE 1, Attach. 3). These provisions are inconsistent because ownership cannot remain with Titan5 until "payment has been received in full" if Titan5 is simultaneously "entitled to take back the software" should payment not be received. Titan5 cannot take back title to software the legal title of which never passed to Majuda. This inconsistency provides further support for the Court's conclusion that there is insufficient record evidence to demonstrate that Plaintiffs are likely to succeed on the merits of the question of who owns the Majuda software.

> We proceeded as if Levy and Ber did have shares in [Majuda] and as though [Majuda] owned the Majuda Software as there was no reason to suspect that the payments would not be forthcoming, or that Tannenbaum was involved in the largest Ponzi scheme in South African history. Once it became known that Tannenbaum was engaged in a Ponzi scheme, an investigation by the authorities ensued. At that time, in the midst of all the chaos, [Majuda] failed to pay for the [Majuda software] (ie. the fact that [Titan5] still owned the [Majuda software] since [Majuda] needed to pay the invoiced historical and ongoing development costs of the Majuda Software in accordance with the Agreement). In any event, [Majuda] was never in a financial position to pay. Whatever the case may be, no payment was made to [Titan5] in respect of the outstanding invoices.

(Kahan Aff. ¶ 17).

In other words, Kahan claims the balance sheet reflected that Titan5 had been paid for the Majuda software (even though it had not), and the amount owed to Titan5 was reassigned to the loan accounts of Ber, Levy, and Kahan (even though proceeds from the Tannenbaum investment had not come to fruition, no money was invested in Majuda, and no money should have been owed to the trio). Thus, according to Kahan, the accounting step that would have accurately reflected a "Titan5 liability" was skipped based on the assumption that the Tannenbaum investment would pay off, not because Titan5 had actually been paid.

Contrary to Kahan's position, Levy testified that he (Levy) and Ber transferred their interests in the Tannenbaum investment to Kahan:

> Q. So you're talking about all your respective investments with Mr. Tannenbaum?
> A. Correct.
> Q. You transferred that investment to the corporation?
> A. No. We transferred it to Mr. Kahan, because he said he would then forward that on to Titan5.
> Q. So you were going to transfer your interest in the Tannenbaum investment to Mr. Kahan in exchange for Mr. Kahan to, then, with the proceeds from that investment, pay Titan5 what was owed for the software?
> A. Correct. What—yea, you know, we were friends at that point, and he told us this was an amount, and we all agreed and put the money into his investment account through Tannenbaum, and then he was supposed to forward that on to Titan5.

(DE 17 at 210).

> Q. And was there any written documentation to reflect this transfer?

6

> A. I've learned the hard way now that agreements between friends need to be in writing, too.
> Q. All right. And did all—did you and Mr. Ber transfer the same amount?
> A. Correct.
> Q. And presumably Mr. Kahan did—he—he took his own share and transferred it to himself, presumably?
> A. Correct.
> Q. And then when—and then your belief was he was going to take the—was he going to liquidate the interest that you transferred to him and then pay Titan for the—
> A. Correct.
> Q.—software?
> A. The three of our interests, yes.
> Q. All right. How could he liquidate your interest in the Tannenbaum investment without you doing something physically to allow him to liquidate it?
> A. Well, I notified Mr. Tannenbaum to transfer that amount of money into Mr. Kahan's investment.
> Q. Okay.
> A. So at that point it was Mr. Kahan's to decide what he wanted to do with it.
> Q. All right. So you made whatever arrangements were necessary to reduce your ownership interest in that Tannenbaum investment and have it transferred over to Mr. Kahan?
> A. Correct.
> Q. And you believe Mr. Ber did the same thing?
> A. Correct.
> Q. Okay. Did you ever have any conversations with Mr. Kahan and Mr. Ber about whether this was—actually had been accomplished, the transfer?
> A. Well, I was never told that it wasn't accomplished.
> Q. All right. And did you ever have any conversations with Mr. Kahan where he acknowledged that he received the transfer and he actually liquidated the investment and paid Titan5?
> A. Not directly, no.
> Q. Well, what do you mean by "not directly?"
> A. No, not directly that he told me they were paid. He didn't tell me they weren't paid either, so . . .
> Q. So you assumed they were paid?
> A. Correct.

(DE 17 at 214–16). Levy further testified that because there was never any liability to Titan5 on Majuda's books, "[s]o far as Majuda was concerned, there was no liability with Titan5." (DE 17 at 218). Levy's position that any debt owed to Titan5 was paid when Levy and Ber transferred to Kahan their interests in the Tannenbaum investment, without more, is plausible. But Levy's position is

further bolstered by Kahan's testimony that he at one point received $1,000,000.00 from Tannenbaum:

> Q. But you invested with Tannenbaum, and you received money from Tannenbaum?
> A. Correct.
> Q. And you received money, what, roughly $2 million?
> A. Not that much.
> Q. Not that much? Something less? A million and a half?
> A. No, less. Probably around about a million dollars. That's over and above the investment that I made.
> Q. Okay. But certainly—
> A. What I'm saying is I'm not sure what the net balance, you know, the net balance is.

(DE 17 at 80).[7]

Plaintiffs' argument is premised on payment never being made to Titan5, thereby entitling Plaintiffs to a reversion of the Majuda software.[8] But both Kahan's and Levy's versions of events plausibly explain why Majuda's balance sheet does not indicate a liability owing to Titan5 for the software: Kahan's version suggests that the liability to Titan5 is still reflected on Majuda's balance sheet in the form of Kahan, Levy, and Ber's shareholder accounts; Levy's version suggests that the Titan5 liability was paid when Levy and Ber transferred their interests in the Tannenbaum investment to Kahan, and no Titan5 liability ever appeared on its balance sheet. Thus, at this stage

---

[7] When questioned by the Court, Kahan testified as follows:

> Q. All right. And did money ever come in from Tannenbaum?
> A. I received personally some money for [sic] Tannenbaum, but no money for Titan5.
> Q. So did any money come in from Tannenbaum that was contemplated that was going to be used to pay Titan5?
> A. No.
> Q. Okay. So the understanding was the money would be paid when we get—when we make our money off of our investment with Tannenbaum, correct?
> A. Correct.
> Q. But there was never any investment money made from Tannenbaum?
> A. Well, it all fell apart, unfortunately, a little bit later than that.

(DE 17 at 126–27).

[8] As explained above, Plaintiffs' theory that Titan5 never transferred ownership in the Majuda software to Majuda is squarely contradicted by Majuda's balance sheet, which lists the Majuda software as an asset during Kahan's stint as CEO.

of the litigation, the Court has insufficient facts to support the issuance of a preliminary injunction because the Plaintiffs have not demonstrated a likelihood of success on the merits on the question of whether the debt owed to Titan5 was not paid.

To the extent Plaintiffs have a compensable interest in the interference by Majuda with the business relationship between Plaintiffs' exclusive distributor and the exclusive distributor's customer, Plaintiffs have not shown they will suffer irreparable injury as a result; nor have they shown that the threatened injury to them outweighs the damage that the proposed injunction may cause to Majuda. Lastly, Plaintiffs have failed to establish that the injunction would not be adverse to the public interest.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Entry of Preliminary Injunction and Memorandum of Law in Support Thereof (DE 4) is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 16th day of April, 2013.

_____
KENNETH A. MARRA
United States District Judge